**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 2:21-cr-394-1 |
| | ) | |
| DEVELL CHRISTIAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM ORDER

Pennsylvania state troopers suspected that Defendant Devell Christian was selling drugs based on visual surveillance of what looked like a drug transaction in the parking lot of a hotel. They executed a traffic stop on Mr. Christian after he drove away from the hotel, had a K9 dog do an exterior sniff of the vehicle, and eventually obtained a warrant to search the car. Drugs were found. Mr. Christian now moves to suppress the drugs (ECF 157). Based on the evidence adduced at the suppression hearing and warrant, the Court finds that the officers' actions were lawful. So the motion will be denied.

## FACTUAL BACKGROUND

On June 10, 2021, Pennsylvania State Trooper Wiskeman and Corporal Isoldi were conducting surveillance of the Super 8 hotel in New Stanton, Pennsylvania. This was because of a tip by a housekeeper who saw drug paraphernalia in one of the hotel rooms. ECF 171 at 10:14. New Stanton has many hotels off the interstate and is a known centralized hub for drug trafficking because of connecting highways and a Greyhound Station serving buses going to and from the Bronx, Newark, Camden, and Philadelphia. *Id.* at 12:1–13. Trooper Wiskeman testified that in his experience, he has conducted a drug arrest at every hotel in the New Stanton area. *Id.*

On the day of the stop involving Mr. Christian, Corporal Isoldi was conducting undercover surveillance in an unmarked car in the parking lot at the Super 8, and Trooper Wiskeman was positioned in a marked car at a nearby credit union. Corporal

Isoldi made the relevant observations, which he communicated over radio in real time to Trooper Wiskeman. ECF 171 at 11:19–14.

Corporal Isoldi was watching the Super 8 when he saw a woman at a nearby Fairfield Marriott exit and then reenter that hotel while on a FaceTime video call. *Id.* at 13:15–21. He started watching her. Twenty minutes later, Corporal Isoldi radioed Trooper Wiskeman that a white Chevrolet Malibu entered the Fairfield parking lot. *Id.* at 13:22–25. The woman who was originally observed FaceTiming placed a large red bag into the trunk of the Malibu. *Id.* at 14:2–8. The woman closed the trunk and then sat in the passenger side of the Malibu for about a minute and a half before returning to the hotel. *Id.* at 14: 7–8. The Malibu then left the parking lot. *Id.* at 14:11–12. Again, all of this was relayed by Corporal Isoldi to Trooper Wiskeman. *Id.* at 13:10–25, 14:1–23.

During this interaction, Trooper Wiskeman ran the Malibu's license plate, and he learned that the vehicle had been stopped in the Jonestown area (near Philadelphia) about a month earlier, with a report of officers finding bulk currency in the car. Although this didn't result in any arrests or charges, based on his training and experience, Trooper Wiskeman believed that the bulk currency meant that Mr. Christian and the other occupant were probably stopped right before they intended to buy drugs. *Id.* at 15:5–11.

After the Malibu left the Fairfield parking lot, Corporal Isoldi told Trooper Wiskeman over the radio that the windows of the Malibu were heavily tinted and there was a tinted license plate cover obstructing the license plate. *Id.* at 15:14–20. Heavily tinted windows and license plate obstruction are violations of Pennsylvania traffic laws. *Id.* at 16:9–16. So once the Malibu turned onto the road, Trooper Wiskeman came from behind his spot at the nearby credit union and started following the Malibu. The driver of the Malibu then appeared to observe Trooper Wiskeman and quickly turned into the New Stanton Park and Ride bus area. *Id.* at 1–3.

Mr. Christian was the driver of the Malibu, and he exited the car as Trooper Wiskeman pulled up near it. *Id.* at 20:4–7. Trooper Wiskeman then exited his vehicle and informed Mr. Christian that he was conducting a traffic stop. *Id.* at 20:7–9. Mr. Christian's exiting his vehicle raised suspicion because based on Trooper Wiskeman's knowledge, training, and experience, individuals will exit vehicles when they are attempting to distance themselves from items that may be concealed in the vehicle. *Id.* at 20:17–24.

Trooper Wiskeman asked Mr. Christian about his travel, and Mr. Christian told Trooper Wiskeman that he had just left the Fairfield where he had met his girlfriend. *Id.* at 21:7–9. Mr. Christian said that he was going to the nearby Citizens Bank for some cash to give to his girlfriend and then planned to return home. *Id.* at 21:9–12. Trooper Wiskeman asked Mr. Christian about his girlfriend's hotel and her last name, but Mr. Christian couldn't provide that basic information. *Id.* at 21:12–14. Mr. Christian did say that he had just returned to the Pittsburgh area from the Bronx and that his girlfriend had just returned from New Jersey and was staying at the Fairfield. *Id.* at 21: 15–17. Mr. Christian told Trooper Wiskeman that his girlfriend drove a rental car from New Jersey to the Pittsburgh area. *Id.* at 21:17. Mr. Christian said that there was no rental car in the parking lot because she had returned it. *Id.* at 21:21–22. But he also didn't know how she got back to the hotel after returning the rental car. *Id.* Trooper Wiskeman said that Mr. Christian had a defensive posture during their conversation, but was not acting aggressive or being uncooperative. *Id.* at 22:1–3. Trooper Wiskeman also testified that Mr. Christian's carotid artery was "vigorously pulsating," which he took as a sign of nervousness. *Id.* at 22:5–6.

Trooper Wiskeman was also suspicious about why Mr. Christian was going to Citizens Bank. *Id.* at 23:10–15. Trooper Wiskeman knew that the Citizens Bank parking lot and the Park and Ride parking lot where Mr. Christian had parked do

not share a conjoining parking lot. *Id.* at 23:14–20. The Citizens Bank has its own parking lot, so Mr. Christian parking in the Park and Ride lot raised Trooper Wiskeman's suspicion. *Id.* at 23:22–24:15.

After Trooper Wiskeman's initial conversation with Mr. Christian, he asked Mr. Christian if he could search Mr. Christian's vehicle. *Id.* at 25:24–25; 26:1–4. Mr. Christian said no. *Id.* at 25:24–25, 26:1–3. Trooper Wiskeman then told Mr. Christian he would call a K9 dog to come to the traffic stop. *Id.* at 26:2–3. Mr. Christian called his attorney. *Id.* at 26:6–10. The attorney  attempted to persuade Trooper Wiskeman to release Mr. Christian from the traffic stop. *Id.* Trooper Wiskeman explained to Mr. Christian that he was welcome to leave while the dog conducted the sniff search. *Id.* at 26: 11–14. If the dog "alerted to the vehicle," then it would be towed to police barracks, and he would apply for a  search warrant. *Id.* at 26:13–18. At that point, Mr. Christian walked away and appeared to take an Uber away from the area, and left the Malibu behind. *Id.* at 26:19–24.

The K9 officer and dog eventually arrived about 50 minutes later, and the dog was alerted to drugs in the vehicle. *Id.* at 29:10–16; Gov't Ex. 1 at 50:00-51:45. So the officers towed the vehicle, and Trooper Wiskeman applied for and obtained a search warrant and searched the vehicle. ECF 171 at 29:17–24. Drugs were recovered during the search. *Id.* at 29:23–24.

## DISCUSSION & ANALYSIS

Mr. Christian offers four grounds for suppression: (1) officers initiated the traffic stop without reasonable suspicion; (2) officers unlawfully extended the traffic stop when they employed a K9 dog to sniff for drugs; (3) the search warrant affidavit lacked probable cause; and (4) Mr. Christian did not consent to the vehicle search. ECF 157. The Court addresses each argument, in turn.

## I. Trooper Wiskeman had reasonable suspicion to initiate the traffic stop.

The vehicle code violations were enough to give Trooper Wiskeman reasonable suspicion for the traffic stop.

A law enforcement officer may initiate a traffic stop when he has reasonable suspicion that an individual has violated a law. *United States v. Delfin-Colina*, 464 F.3d 392, 399–400 (3d Cir. 2006). "[A]n officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination." *Id.*

At the suppression hearing, Trooper Wiskeman credibly testified that he observed Mr. Christian's vehicle in violation of two Pennsylvania traffic laws: the Malibu had heavy window tinting and a tinted license plate cover that obstructed Trooper Wiskeman's view of the license plate. ECF 171 at 15:14–20. And the dash-cam footage of the traffic stop confirmed as much. Gov't Ex. 1. The Pennsylvania vehicle code prohibits dark window tinting that obstructs the view inside a vehicle and license plate obstruction. 75 Pa. Cons. Stat. §§ 4524(e)(1); 1332(b)(3); *United States v. Stewart*, 92 F.4th 461, 465 (3d Cir. 2024). Trooper Wiskeman therefore had reasonable suspicion to initiate the stop.

## II. Trooper Wiskeman had reasonable suspicion to extend the stop and employ a dog search.

The next question is whether Trooper Wiskeman had reasonable suspicion to extend the stop from its original purpose (vehicle violations) to then get the K9 dog. He did.

A traffic stop may last only as long as reasonably necessary to effectuate the purpose of the stop. *Rodriguez v. United States*, 575 U.S. 348, 350, 354 (2015) ("Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." (cleaned up)). A "traffic stop may last as long as needed to address the traffic violation that warranted the stop and attend to related safety concerns." *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020) (cleaned up). These related inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.

"To prolong the stop past this time needed to address the traffic violation, the officer must have—at the moment the stop is extended—reasonable, articulable suspicion of criminal activity separate from the traffic violation." *United States v. Romero*, 559 F. Supp. 3d 437, 447 (W.D. Pa. 2021) (Ranjan, J.) (cleaned up). The Court must then decide whether the stop was extended at all—this is known as the "*Rodriguez* moment." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018). If the stop was extended, then, the Court assesses whether the facts available to the officer at that moment were sufficient to establish reasonable suspicion that criminal activity was afoot. *Id.*

Reasonable suspicion is a less demanding standard than probable cause. It requires "more than a mere hunch" and "only a particularized and objective basis for suspecting criminal activity." *Id.* at 183 (cleaned up). "In assessing reasonable suspicion, three themes must remain front and center: (1) reasonable suspicion must always be evaluated under the totality of the circumstances; (2) when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, to make inferences from and

deductions about the cumulative information available to them that might well elude an untrained person; and (3) reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." *Romero*, 559 F. Supp. 3d at 447 (quoting *Green*, 897 F.3d at 183) (cleaned up).

Applying these principles, Trooper Wiskeman had reasonable suspicion to extend the stop even from the earliest possible *Rodriguez* moment. That moment was when Mr. Christian exited the vehicle upon being pulled over. But before that point, as Trooper Wiskeman credibly testified, he had reasonable suspicion that Mr. Christian might be involved in drug trafficking activity. For example, when Trooper Wiskeman ran the Malibu's license plate (before the stop), he learned that the vehicle had been stopped in the Jonestown area six weeks earlier and officers reported that Mr. Christian was in the vehicle and had bulk currency in a book bag, which suggests that the occupants could purchase narcotics. ECF 171 at 15:5–11. Also before the stop, Corporal Isoldi had relayed to him that a woman at the hotel put something in the trunk of the Malibu, sat in the passenger seat, and then exited the vehicle—suggestive of a drug transaction. *Id.* at 14:7–8.

And then once the traffic stop commenced, the red flags increased within seconds. Trooper Wiskeman testified that Mr. Christian exited the vehicle—something common with individuals who are attempting to distance themselves from contacts in the vehicle—and Mr. Christian was unable to answer basic questions about the woman he referred to as his girlfriend. *Id.* at 20:17–24, 21:21–22. Trooper Wiskeman also observed that Mr. Christian's carotid artery was "vigorously pulsating," which Trooper Wiskeman has observed in nervous individuals. *Id.* at 22:5–8. This, together, was reasonable suspicion of drug activity, sufficient to extend the stop to call the dog for an exterior sniff.

True, it took about 50 minutes for the K9 officer and dog to arrive on scene (though Mr. Christian had already left).    But that does not render the stop unconstitutional.  Prolonging a stop is only a constitutional problem when the officer lacks reasonable suspicion to prolong the stop beyond the initial traffic-code violation, or when property is seized beyond a reasonable time.

Here, the trooper had reasonable suspicion of possible drug activity almost immediately, and that warranted extending the stop and calling for the dog.  *See United States v. Wilson*, 960 F.3d 136, 146 (3d Cir. 2020) (finding that officer did not impermissibly prolong a traffic stop wherein he developed reasonable suspicion of criminal activity while questioning driver and passengers and subsequently extending the traffic stop); *see also United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) ("We hold Trooper Ramirez had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation. So no unlawful extension of the traffic stop ever occurred.")

And the 50-minute wait for the K9 officer and dog to arrive was not an unreasonable delay and did not offend the Fourth Amendment.  *See United States v. Frost*, 999 F.2d 737, 738 (3d Cir. 1993) (holding that 80–minute delay between seizure and "olfactory inspection" of defendant's luggage did not render search unreasonable, absent any indicia of lack of diligence by police officers); *United States v. Johnson*, 742 F. App'x 616, 621–22 (3d Cir. 2018) ("We likewise reject Johnson's argument that the officers could have expedited the start of the dog sniff, which did not occur until twenty-five minutes after Iggy arrived, and more than one hour after the stop.").

Consider too that Mr. Christian had left the scene while the troopers waited for the dog.  ECF 171 at 26:11–25; 27:1–3.  This is significant in two respects.  First, because he left, that lessened any urgency of getting the dog on scene, making the 50-minute delay more reasonable.  Second, by leaving and basically abandoning the car,

Mr. Christian waived any right to invoke a *Rodriguez*-based argument. *See Rodriquez v. United States*, 575 U.S. 348 (2015) (remanding to the Eighth Circuit whether the prolonged detention of a *motorist*, that is, a *person* rather than a *person's property*, was supported by reasonable suspicion).

In sum, Trooper Wiskeman had the requisite reasonable suspicion of drug activity before he extended the stop. The duration and scope of the traffic stop were lawful.

### III.    There was sufficient probable cause in the search-warrant affidavit.

After the dog alerted to drugs, the officers had the vehicle towed to the barracks, and then they applied for a search warrant to search the interior. Mr. Christian argues that the search warrant affidavit submitted by law enforcement did not contain sufficient probable cause. ECF 157 at 2. The Court finds that it did.

"[A] reviewing court may not conduct a de novo review of the magistrate judge's determination of probable cause." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000). Instead, the "reviewing court must determine only that the magistrate judge had a substantial basis for concluding that probable cause existed to uphold the warrant." *Id.* (cleaned up). Reviewing courts should give a magistrate judge's finding of probable cause "great deference." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "A magistrate judge may find probable cause when, viewing the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (cleaned up).

The search-warrant affidavit contained sufficient evidence to support probable cause of drugs in the vehicle. The affidavit includes, among other facts, a detailed summary of Trooper Wiskeman's background, training, and experience related to drug trafficking; the surveillance on the day of the traffic stop when the officers  saw a woman place a bag into Mr. Christian's trunk in a hotel parking lot; the vehicle

inquiry Trooper Wiskeman ran before the traffic stop that revealed that Mr. Christian's vehicle had been stopped a month prior and officers uncovered bulk currency; Mr. Christian's being unable to answer certain questions about his alleged girlfriend; and the police dog being alerted to contraband.  ECF 157-1.

Based on the totality of these facts,  the Court finds that the magistrate had a substantial basis to find probable cause based on the evidence proffered in the search-warrant affidavit.

## IV.    Mr. Christian's lack of consent to the vehicle search is immaterial.

Finally, Mr. Christian argues that evidence from the vehicle search should be suppressed because Mr. Christian never consented to the search.  ECF 157 at 2. Mr. Christian does not specify whether he refers to the dog sniff or the execution of the search warrant.  Either way, the Court has, as noted above, concluded that the search warrant affidavit is supported by sufficient probable cause and that the dog sniff search was not a product of an illegal stop.  So Mr. Christian's consent didn't matter.

<u>CONCLUSION</u>

For the above reasons, the Court **DENIES** Mr. Christian's motion to suppress (ECF 157).

DATE: June 12, 2026

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge